## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 08 2015, 7:50 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Donald E.C. Leicht
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: J.W. (Minor Child), | June 8, 2015 |
| | Court of Appeals Case No. 34A05-1411-JT-526 |
| R.W. (Father),<br>*Appellant-Respondent*, | Appeal from the Howard Circuit Court |
| v. | The Honorable Lynn Murray, Judge |
| The Indiana Department of Child Services,<br>*Appellee-Petitioner*. | Cause No. 34C01-1405-JT-115 |

**Brown, Judge.**

R.W. ("Father") appeals the involuntary termination of his parental rights with respect to his son, J.W. Father raises one issue, which we revise and restate as whether the evidence is sufficient to support the termination of his parental rights. We affirm.

## Facts and Procedural History

On February 7, 2013, the Indiana Department of Child Services, Local Office in Howard County ("DCS") received a report that J.H. ("Mother," and collectively with Father, "Parents") had given birth to J.W. the day before and she had tested positive for methadone and benzodiazepines at the time of birth.[1] The report indicated that J.W. was born drug positive and was suffering from severe withdrawal, and that Parents had engaged in domestic violence at the hospital. On March 12, 2013, DCS removed J.W. from Parents and placed him in foster care. The next day, a petition alleging that J.W. was a Child In Need of Services ("CHINS") was filed alleging in part that: (A) Father "was also

---

[1] The court also terminated Mother's parental rights to J.W. On November 26, 2014, Mother filed a notice of appeal under this cause number. On February 18, 2015, DCS filed a Motion to File Consolidated Brief and to Set Brief Due Date, and on February 24, 2015, this court issued an order granting DCS's motion and ordering that DCS's brief "be filed no more than thirty (30) days from the date on which [Mother's] brief is filed." Docket (capitalization omitted). The notice of completion of transcript was entered on January 15, 2015, and accordingly Mother's brief was due on February 16, 2015. Mother failed to submit a brief or file a motion for an extension of time to file a brief, and DCS timely filed its brief on March 6, 2015. Because Mother did not file a brief and does not participate in this appeal, we limit our recitation of the facts to those pertinent solely to Father's appeal.

attending Premier Care methadone clinic and also tested positive for substances that he did not have a prescription for"; (B) hospital staff had numerous concerns for J.W.'s safety and specifically once found mother "passed out" holding J.W. and had to remove J.W. from her arms, and on another occasion found J.W. "completed [sic] covered, including his entire face, with a heavy blanket trying to free himself" and hospital staff had a hard time waking Mother; (C) Parents were banned from the hospital due to numerous disturbances and were escorted from the property by police, and Mother "was observed to have what appeared to be 'choke marks' on her neck and [Father] had abrasions on his face"; and (D) Parents did not have suitable housing for themselves or J.W. DCS Exhibit 2.

[3] On April 22, 2013, the court adjudicated J.W. a CHINS based on the allegations in the petition. On May 20, 2013, the court held a dispositional hearing and, following the hearing, entered an order (the "Dispositional Order") in which it in part ordered Parents to do the following: (1) cooperate with DCS; (2) notify DCS of their contact information; (3) maintain contact with DCS; (4) notify DCS of any cancellations of scheduled appointments within twenty-four hours; (5) complete a parenting program; (6) follow the visitation plan wherein any visits are subject to providing DCS with a negative drug screen at the discretion of DCS; (7) not use any drugs or alcohol except to the extent prescribed by a physician; (8) participate in random drug screens; (9) obtain clean, suitable, and stable housing and allow DCS access into the home;

(10) obtain and maintain gainful employment; and (11) participate in a substance abuse assessment and follow all recommendations. The permanency plan was for reunification.

[4] The court held a periodic review hearing on August 26, 2013, and found in part that Father had not visited J.W. since August 8, 2013, due to failed drug screens, he had not completed a substance abuse assessment, he had been "minimally compliant with his parent educator and homemaker," he had obtained employment through Kokomo Cab, and he had "obtained housing." *Id.* On November 25, 2013, the court held another periodic review hearing and found that Father had not complied with the case plan, had not enhanced his ability to fulfill his parental obligations, had not visited the child consistently, and had not cooperated with DCS. The court also found that Father had not found suitable housing and that his visitation had been suspended due to noncompliance with drug screens "and will be reinstated once [he] submit[s] a negative drug screen." *Id.*

[5] On March 3, 2014, the court held a permanency hearing and entered an order in which it found that Father was not in compliance with the permanency plan in the following ways: he did not visit with J W. from the middle of November until the beginning of February, he did not participate in drug screens for over two months and still needed to complete his substance abuse assessment, and he had just begun participating in services with a Parent Educator and Homemaker at the beginning of February. The court also found that "Father

needs to obtain stable and safe housing. [He] is currently staying at Motel 6 and is working at Kokomo Cab." *Id.*

[6] On May 16, 2014, DCS filed its Petition for Involuntary Termination of the Parent-Child Relationship of J.W. with Parents (the "Termination Petition"). On May 19, 2014, the court held a periodic review hearing and issued an order in which it found that Father had not complied with the case plan, nor had he enhanced his ability to fulfill his parental obligations. The court further found that Father continued to be employed at Kokomo Cab and had tested positive for methamphetamine, amphetamine, and oxycodone.

[7] On August 11, 2014, the court commenced a termination hearing. Kevin Jones testified that he worked with Father providing homemaker and parent education services, which included "employment, housing, transportation assistance, and contact for regular random drug screens," and Father had not been compliant with services because "[m]any appointments were either missed or canceled," specifically noting that about fifty percent of the time Parents did not show for the meetings, and that on other occasions they overslept or simply forgot. Transcript at 5. He testified that in general, the phone number he had been given to reach Father "was either shut off or did not work." *Id.* He noted that Father worked for Kokomo Cab, that housing had not been obtained, noting that Father and Mother were living at Motel 6, which provided "inappropriate space," and that Father had not been attending a relapse prevention program. *Id.* at 16.

[8]     Mother testified that after J.W.'s removal she lived with her paraplegic father to help care for him, and DCS at one point told her she could not live there and regain custody of J.W. because her father "had a sexual misconduct with a minor" and was a registered sex offender. *Id.* at 39. She testified that she, along with Father and her father, were living at Motel 6 in a room with two double beds.

[9]     Father testified that he has worked for Kokomo Cab since June 24, 2013, and that he averages approximately $2,500-3,000 per month in earnings. When asked if he had "struggled with the use of drugs throughout" the course of the case, Father responded: "Uh, yeah, I mean a little bit," and further testified that he "dropped dirty for Meth one time. Then maybe some pain pills every now and then because I've got a severe deformity in my left foot and leg . . . ." *Id.* at 49. Father admitted that the week before the hearing he tested positive for Methadone and that he did not have a prescription for the pain pills he had taken.

[10]    Lesley Echelbarger, who served as the DCS family case manager beginning in May 2013 ("FCM Echelbarger"), testified that J.W. had been removed from Parents' care for the past seventeen months, and that Father tested positive for Suboxone during the first review period, for hydrocodone on September 4, 2013, for amphetamines on October 17, 2013, for methamphetamine on December 17, 2013, for methamphetamine on May 9, 2014, for methadone on July 22, 2014, and for methamphetamine on July 31, 2014. She also testified

that Father did not always submit drug screens when requested, that at times she would not have a correct cell phone number to contact him, that DCS did not hear from him in December or January, and that he did not start substance abuse treatment during that time. She indicated that between March and May of 2014 Father began an Intensive Outpatient Program ("IOP") for substance abuse but that "he dropped out shortly after beginning." *Id.* at 70. She noted that Father's visitations were suspended on numerous occasions but that he would attend when they were not suspended, and that during the most recent review period Father had not consistently cooperated with his parent educator.

[11] FCM Echelbarger further testified that at the time of the hearing Father continued to be employed by Kokomo Cab and to live at Motel 6, that to date he had not completed a parenting program or a drug treatment program, he had not refrained from using drugs or alcohol, and that he was not currently attending any treatment program. She testified that Father's visits have not progressed from fully supervised visits, that she did not believe the conditions that led to J.W.'s removal would be remedied because Father continues to struggle with substance abuse and had failed to maintain stable and safe housing, and that J.W. is "absolutely thriving" in foster care. *Id.* at 77. Regarding Father's room at Motel 6, FCM Echelbarger explained that it was not stable or safe because

> [Mother] has her father living with her and [DCS] is aware that he was registered as a sex offender and our policy prohibits [J.W.] being

placed there with him, as well as the size and he's a very, very active boy. He's almost out of the crib. He will be shortly so there's no bed for him. He's just very active, climbing, running, playing, jumping and the hotel room is clean but still very small for four people.

*Id.* at 78-79. She testified that termination was in J.W.'s best interest because he

needs a safe, stable environment. He needs an environment and family members that are free from drugs. He needs to not live a transient lifestyle not knowing if they're going to have housing or not knowing if he's going to have to live in a hotel room. He needs to know, he needs a future where his parents are free from drugs and he won't have to experience what his older sister experienced.

*Id.* at 79. She further testified that continuation of the parent-child relationship posed a threat to J.W.'s well-being because "the continued drug use poses a threat to him, the unsafe people that could be coming around, the buying of drugs that are not prescribed. The risk for overdose with [J.W.] in their care." *Id.* at 80. She testified that the plan for the care and treatment of J.W. was adoption.

[12] The termination hearing resumed on September 8, 2014, and FCM Echelbarger testified that between the first hearing and that day Parents participated in two requests for drug screens but failed to appear numerous other times for drug screens. She testified that both Father and Mother had not been cooperative with their parent educator or with their substance abuse treatment, that she had not had contact with Father other than a request for a new parent educator, and that although it had been reported through another party that Parents had a

house, it had not been reported to her. She testified that her recommendation that Father's parental rights be terminated had not changed.

[13] On cross-examination FCM Echelbarger testified that J.W.'s current foster mother was interested in adopting him and that it was in J.W.'s best interest to be adopted by her. Parents' counsel asked whether it was in J.W.'s "best interest to be adopted by a person who's in her sixties," and FCM Echelbarger responded: "That is something that we are in the process of considering, I mean once we would have this decision." *Id.* at 112. She noted that J.W. is "very bonded to her and that is also something that we are considering. We're assessing it and considering it." *Id.* at 112-113.

[14] DCS next called Sharon Leach, who was J.W.'s Court Appointed Special Advocate ("CASA"), who testified that she prepared a report filed on July 30, 2014, regarding the case. Leach testified that J.W. "seems to be happy, healthy" living with his foster mother. *Id.* at 124. When asked if termination of Father's parental rights was in J.W.'s best interest, Leach testified: "The thing that concerns me is the drug use," and that "if they can't stay clean I think it's in J.W.'s best interest." *Id.* at 126-127. Leach indicated that foster mother was seventy years old and that she did not believe it was in J.W.'s best interest to be adopted by someone who is seventy years old.

[15] Father was called by his counsel to the stand, and he testified that he has worked for Kokomo Cab for fifteen months, works an average of six days per

week, and averages about six or seven hundred dollars in take-home pay per week. He stated that he has struggled with addiction to methamphetamine and amphetamines for thirty years but that he believed that "for the most part" he now had his addiction under control. *Id.* at 137. He testified that both he and Mother moved into a three-bedroom home and that Mother's father was also residing in the home, although Mother's father was "seeking his own residence next month or the month after." *Id.* at 140. He stated that he did not complete IOP because it conflicted with his job, and that he was taking Suboxone as part of a substance abuse treatment program. He testified that he was not on the lease for the new home because they had been denied on previous lease applications due to a previous eviction and his "background history . . . ." *Id.* at 154. On cross-examination, he testified that Mother's father was on the lease for the new home. When asked if Father was aware that "the lease states that only the people on the lease are to reside unless their names are at the end of the lease," he responded: "I have no idea, I haven't read the lease but he does know I'm residing there." *Id.* at 159.

[16] On October 27, 2014, the court entered a fourteen-page order granting termination of the parent-child relationship between J.W. and Parents (the "Termination Order") which made specific findings consistent with the foregoing. The Termination Order states in part:

> 16. On August 26, 2013, the court conducted a six month review hearing at which the Parents appeared with public defender counsel

Dechert. . . . The Court found . . . . Father had [] been provided with regular supervised visitation with the child, however, his visitation had been suspended since August 8, 2013 due to his failure to submit to drug screens. Father had not completed his substance abuse assessment and had been minimally compliant with his parent educator and homemaker. Father had obtained employment through Kokomo Cab. The Court found that all of the child's needs were being well met through his foster care placement and services. The casegoal was reunification.

17. The court held a three month review hearing on November 25, 2013, at which the parents appeared with public defender counsel, Dechert. The parents had been provided weekly supervised visitation with the child and their attendance was sporadic at times. The parents had failed drug screens over the review period which also disrupted visitation. Visitation was suspended at the time of the hearing due to non-compliance with drug screens to be reinstated once they submitted a negative drug screen. . . . [N]either parent had participated in a substance abuse assessment. The parents continued to be minimally compliant with the Parent Educator. . . . Father continued to work at Kokomo Cab. The parents were staying at Motel 6. The court found that DCS was making reasonable efforts to provide services to the parents and reunify family. . . .

18. The court conducted the twelve month permanency hearing on March 3, 2014 . . . . The court found that . . . parents were not in compliance with the case plan and no progress had been made toward reunification. The parents had been provided weekly supervised visitation with the child, however, they did not visit from the middle of November 2013 until the beginning of February 2014. The parents still needed to complete their substance abuse assessments so it could be determined if they needed treatment. The parents had just began participating in Parent Educator and Homemaker services again at the beginning of February 2014. The parents were still staying at Motel 6 and [F]ather continued to work for Kokomo Cab. The Parents informed the court that they were starting Intensive Outpatient Program ("IOP") on March 11, 2014. . . .

19. The court conducted a three month review hearing on May 19, 2014 . . . . The parents did not have suitable or stable housing as they had continued to live at Motel 6 since November 2013. The parents were minimally compliant with their Parent Educator and were not complying with IOP/Relapse Prevention Program at Community Howard Behavioral Health. . . . Father had tested positive for Methamphetamine, Amphetamine and Oxycodone. The Father continued to be employed by Kokomo Cab. . . . The two casegoals were either reunification or adoption.

* * * * *

21. . . . . Since removal and placement in foster care, the child had never been placed with the parents, as they have made minimal to no progress towards their ability to provide for and safely care for the child. The parents have failed to consistently participate with DCS and service providers, and have failed to show a willingness or ability to address their substance abuse addictions. The parents' visitation and participation has been inconsistent.

22. Kevin Jones had been providing homemaker and parenting services to Parents since late April 2013. The parents were inconsistent in attending appointments and would frequently no show due to oversleeping or forgetting the appointments. Mr. Jones had difficulty making contact with the parents due to their phone frequently being shut off or not working. . . .

* * * * *

26. Father admitted that he has struggled with his drug addiction for thirty (30) years and that his drug of choice is Methamphetamine. Father admitted to recently testing positive for Methamphetamine on July 31, 2014. Father had not participated in drug treatment in the CHINS case, as he maintained that his employment precluded his participation. Father has been employed with Kokomo Cab since June 2013.

27. Since DCS had removed the child, the parents had not submitted to random drug screens consistently, had not followed the recommendations of their substance abuse assessments, and had not consistently attended visitation. The parents had not obtained suitable, stable housing as they resided at a few different residences

until they started staying at the Motel 6 several [sic] in November 2013. The Motel 6 was not suitable as it was a small room and the parents resided with a convicted sex offender.

* * * * *

29. Father's substance abuse assessment recommended he attend IOP; however, he dropped out of the program shortly after starting. When Father submitted to requested drug screens, he also passed more than he failed; however, Father tested positive for Hydrocodone on September 4, 2013; Amphetamines on October 17, 2013; Methamphetamines on December 17, 2013, May 8, 2014, and May 9, 2014; Oxycodone on May 9, 2014; Methadone on July 22, 2014; and Methamphetamines on July 31, 2014.

30. The parents have not consistently attended visitation due to their drug use and failure to submit to random drug screens when requested. Although the parents would sometimes pass a drug screen, they would then fail to submit to their next drug screen before scheduled visitation could take place, causing visitation to be suspended again. The failure to exercise the right to visit one's child demonstrates a lack of commitment to complete the actions necessary to preserve the parent-child relationship. *Lan*[*g*] *v. Starke County Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Visitation between the child and the parents has not progressed from fully supervised and visitation has only taken place at The Villages.

31. The parents have not made any sustained progress since the removal of the child eighteen (18) months ago, as the parents have not made the child a priority over their substance abuse. The child deserves permanency, stability and structure that the parents are unable to provide. The child deserves to [sic] a future with caregivers who are drug free and not living a transient lifestyle. The child requires the security of safe, nurturing environment and routine providing him with stability.

* * * * *

37. The child's CASA, Sharon Leach, was appointed on September 13, 2013. . . . At the termination hearing, CASA Leach opined that due to the parents continued drug use, the termination of parental

rights was in the best interest of the child. CASA Leach submitted a detailed report and testimony that supports her conclusions.

38. The court finds by clear and convincing evidence that it is reasonably probable that the conditions that led to the removal and that led to continued placement outside the home, namely parents' inability to provide the child with a safe, suitable home free of substance abuse, will not be remedied to the degree that they will be able to provide the child with the nurturing, stable, and appropriate care and environment that he requires on a long term basis. The parents have not consistently cooperated with DCS or service providers over the past eighteen (18) months. The parents have not consistently participated in substance abuse treatment to address their long term drug addictions. . . .

39. The court further finds by clear and convincing evidence that the continuation of the parent-child relationship between the child and his parents poses a threat to the well being of the child. A termination of the parent-child relationship is in the best interest of the child because the child needs permanency with caregivers who can provide him with a nurturing environment that is secure and free of abuse and neglect and meets the child's needs until the child reaches the age of majority. The parents have demonstrated no ability to parent the child or to provide him with the nurturing, stable, safe environment that he requires on a long term basis. . . . The Court finds that the Parent's [sic] inability to refrain from substance abuse, demonstrates their inability to provide a safe, stable and caring environment for the child.

40. The court further finds by clear and convincing evidence that termination of the parent-child relationship of the parents to the child is in the best interests of the child in that further efforts to reunite the parents and child are unlikely to succeed. The failure to terminate the relationship will deny the child stability and permanency to which he is entitled, and has too long been denied. It is in the child's best interests to have permanency, not perpetual foster care and uncertainty in his life.

41. The court further finds by clear and convincing evidence that the DCS has a satisfactory plan for the care and treatment for the child, which plan is to place him for adoption.

Appellant's Appendix at 11-20.

### *Issue / Standard of Review*

[17] The issue is whether the evidence is sufficient to support the termination of Father's parental rights. The involuntary termination of parental rights is the most extreme measure that a juvenile court can impose and is designated only as a last resort when all other reasonable efforts have failed. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). This policy is in recognition of the Fourteenth Amendment to the United States Constitution which provides parents with the right to establish a home and raise children. *Id.* However, these protected parental rights are not absolute and must be subordinated to the child's interest to maintain the parent-child relationship. *Id.*; *see also Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992) (noting that the "purpose of terminating parental rights is not to punish parents, but to protect the children") (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 101 S. Ct. 2153 (1981), *reh'g denied*). Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind.

Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied*, 534 U.S. 1161, 122 S. Ct. 1197 (2002); *see also Bester*, 839 N.E.2d at 147; *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (noting that this court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made") (quoting *Egly*, 592 N.E.2d at 1235). Thus, if the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[20] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87

S. Ct. 824 (1967), *reh'g denied*). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A)).

## *Discussion*

In his brief, Father challenges the Termination Order based upon the requirements of Ind. Code § 31-35-2-4(b)(2)(B)-(D).

### A. *Remedy of Conditions*

[21]   We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of J.W. outside Father's home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[22]   In determining whether there exists a reasonable probability that the conditions resulting in a child's removal or continued placement outside a parent's care will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App.

2013). Due to the permanent effect of termination, the trial court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *McBride*, 798 N.E.2d at 199. Moreover, a trial court "can reasonably consider the services offered by the [DCS] to the parent and the parent's response to those services." *Id.* In addition, "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The burden for the DCS is to establish "only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[23] In arguing that the court's conclusion that the reasons for J.W.'s placement outside the home will not be remedied, Father challenges certain findings in the Termination Order that he did not comply with the Dispositional Order. He argues that he has held steady employment with Kokomo Cab since June 2013,

works six days per week, and averages $600-$700 per week in take home pay. He asserts that he obtained "clean, stable, and suitable housing" when he began living at Motel 6 in November 2013, noting specifically that "[h]is living accommodations have all utilities consistently provided, and other families and children live there." Appellant's Brief at 7. He maintains that to the extent the court found in its Termination Order that the housing situation was not acceptable because Mother's father, a convicted child molester, was staying there, Mother's father is an invalid who is confined to a bed or wheelchair, and further he would be moved out if it were the only issue keeping him from reunifying with J.W. He further asserts that he now lives in a three-bedroom home and states that he was compliant with the parent educator, although he did not complete the program. He further asserts that he tested clean on a majority of his drug screens and that he did not complete IOP both because he and Mother could not participate at the same time and she was chosen to go first, and because it conflicted with his employment schedule. He argues that "he has made substantial progress and that DCS has failed, given his progress, to prove that 'the reasons for placement outside the home of the parents will not be remedied' . . . ." *Id.* at 8.

[24] To the extent that Father's arguments ask this court to reweigh the evidence presented, we note that we will not do so and will consider only the evidence and reasonable inferences most favorable to the judgment. *See Bester*, 839 N.E.2d at 147.

[25] As noted, the court framed the reason for J.W.'s removal as "parents' inability to provide the child with a safe, suitable home free of substance abuse . . . to the degree that they will be able to provide the child with the nurturing, stable, and appropriate care and environment that he requires on a long term basis," and it found by clear and convincing evidence that it is reasonably probable that the conditions that led to the removal and that led to continued placement outside the home would not be remedied because: "The parents have not consistently cooperated with DCS or service providers over the past eighteen (18) months. The parents have not consistently participated in substance abuse treatment to address their long term drug addictions" and that "the Parent's [sic] inability to refrain from substance abuse demonstrates their inability to provide a safe, stable and caring environment for the child." Appellant's Appendix at 19. Thus, the court focused its conclusion regarding Ind. Code § 31-35-2-4(b)(2)(B)(i) on Father's lack of consistent cooperation with DCS service providers, inconsistent participation in substance abuse treatment, and inability to refrain from substance abuse.

[26] Based upon the court's findings and the record, as discussed herein, we conclude that clear and convincing evidence supports the trial court's determination that there was a reasonable probability that the conditions leading to J.W.'s removal would not be remedied and that the court's conclusion is not clearly erroneous.

B. *Best Interests and Satisfactory Plan*

We next consider Father's assertions that DCS failed to demonstrate that termination of his parental rights was in J.W.'s best interests or that there is a satisfactory plan for the care and treatment of J.W. Father argues that DCS did not prove that termination was in J.W.'s best interest and "actually proved the exact opposite" because "DCS's 'satisfactory plan' is for JW to be adopted by his seventy-year-old foster mother." Appellant's Brief at 9. Father argues that "JW is an infant" and "[e]ven the CASA testified that such a place was not acceptable." *Id.*

First, we are mindful that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Children have a paramount need for permanency, which the Indiana Supreme Court has called a central consideration in determining the child's best interests. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. This court has previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by

clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*. This court has previously recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*.

[29] At the termination hearing on August 11, 2014, FCM Echelbarger testified that it was in J.W.'s best interest that Father's parental rights be terminated because J.W needs safety, stability, and a drug-free environment. "He needs to know, he needs a future where his parents are free from drugs and he won't have to experience what his older sister experienced." Transcript at 79. When the hearing resumed on September 8, 2014, she testified that her recommendation had not changed. When asked if termination of Father's parental rights was in J.W.'s best interest, CASA Leach testified: "The thing that concerns me is the drug use," and that "if they can't stay clean I think it's in J.W.'s best interest." *Id.* at 126-127.

[30] Based on the totality of the evidence as discussed and set forth in the trial court's order, including the recommendation of FCM Echelbarger and CASA Leach, and in light of our deferential standard of review, we conclude that the court's determination that termination was in J.W.'s best interests is supported by clear and convincing evidence. *See In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct.

App. 2013) (observing that "[r]ecommendations of the case manager . . . in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests"), *reh'g denied*; *In re A.I.*, 825 N.E.2d at 811 (testimony of court appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside the home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

[31] Also, to the extent Father suggests that DCS did not make the requisite showing under Ind. Code § 31-35-2-4(b)(2)(D) that there is a satisfactory plan for the care and treatment of J.W., we observe that Indiana courts have traditionally held that for a plan to be "satisfactory" for the purposes of the termination, it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*. A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the child. *Id.* There need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *Id.* Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the child. *Id.* Part of the reason for this is that it is within the authority of the adoption court, not the

termination court, to determine whether an adoptive placement is appropriate. *Id.*

[32] In Finding 41, the court found "by clear and convincing evidence that the DCS has a satisfactory plan for the care and treatment for the child, which plan is to place him for adoption." When asked at the termination hearing about the prospects of J.W. being adopted by foster mother, FCM Echelbarger testified that DCS was "assessing it and considering it." *Id.* at 112-113. Thus, at the termination hearing, DCS presented adoption as its plan, which the court found to be satisfactory. Despite Father's suggestion to the contrary, DCS did not present evidence of a final plan for adoption involving foster mother; rather, it was in the process of considering her as an option. We cannot say that the court's finding that DCS's plan of adoption for J.W. was satisfactory is clearly erroneous.

## *Conclusion*

[33] We conclude that the trial court's judgment terminating the parental rights of Father is supported by clear and convincing evidence. We find no error and affirm.

Crone, J., and Pyle, J., concur.